## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOHAN SEBASTIAN ALZATE CALIXTO, )
   acting on behalf of infant child, )
M.A.Y., )
                                     )       Case No.: 8:17-cv-2100-T-33JSS
              Petitioner, )
                                )
   -against- )
                                )
HADYLLE YUSUF LESMES, )
                                )
             Respondent. )
                                )

## PETITIONER'S POST-TRIAL BRIEF

### I. FACTS AND BACKGROUND

The Petitioner, JOHAN SEBASTIAN ALZATE CALIXTO, filed his Verified Petition on September 1, 2017, seeking return of the five year old child, M.A.Y., to Colombia pursuant to Article 12 of the Hague Convention. In his Verified Petition, the Petitioner alleged that both he and Respondent are Colombian citizens, and that he and the Respondent were not married, but that they lived in a domestic relationship for seven years in Bogota, Colombia; and that their daughter, M.A.Y. was born in Bogota, Colombia on 6/17/2012 (Verified Petition, ¶¶ 9-12). The Petitioner acknowledged his paternity of the child on the birth certificate. (Verified Petition ¶ 12 and Petitioner's Composite Exhibit 1c). The Petitioner alleges that M.A.Y. resided in Bogota, Colombia from birth until the Respondent's removal of the child from Colombia in November of 2015, which resulted in a wrongful retention as of November 24, 2016. (Verified Petition ¶¶12-13). Respondent admitted at trial that the parties were in a joint custodial family relationship with the child from her

1

birth in Colombia in 2012 through at least August of 2015. She further admitted on cross examination that the Petitioner maintains equal, 50/50 custody rights in Colombia at the date of these proceedings. The parties celebrated the child's birthdays and Catholic baptism in Colombia with both maternal and paternal sides of the child's family. (Petitioner's Composite Exhibit 11). The undisputed trial testimony also confirms that prior to the alleged wrongful retention, the parties and their child lived with the Respondent's mother at her house in Bogota, Colombia; and the Petitioner continues to live in the same house at the time of these proceedings. Petitioner alleges that prior to the child leaving Colombia in November of 2015, the parties had discussed the possibility of moving to Florida to live as an "intact family". To that end, the Petitioner alleges that Respondent left the child in the care of the Petitioner in Colombia on three occasions prior to November, 2015, one occasion having been one year in length, while Respondent traveled to the United States to stay with her father in Florida. These travels to the United States occurred in the following time frames: August of 2013, until October of 2013; April of 2014, until July of 2014; and November of 2014, until October 31, 2015. During these visits, the Respondent, already a "green card" holder, made application for the child's "green card." The parties ultimately agreed that Respondent could return to Colombia and travel to Florida with the child in November of 2015, and that Respondent would initiate immigration proceedings for Petitioner. Respondent traveled back to Colombia from the United States on October 31, 2015. Petitioner alleges that the agreement between the parties was that he would be joining them in Florida within one year. (Verified Petition at ¶14). Respondent admitted on direct examination that Petitioner maintained the subjective understanding that Respondent could secure some type of travel papers for him to be able to travel to the United States.

To permit the Respondent to travel outside of Colombia with the minor child and pursue

these immigration issues on behalf of Petitioner, Petitioner agreed to execute an "Authorization Permission to Leave the Country Format for Minors", for the child to leave the country, which was presented to the Minister of Foreign Affairs in Bogota, Colombia. (Petitioner's Exhibit 1d).[1] It is undisputed by both parties that the form was mandatory in order that the minor child be permitted to leave Colombia. The travel authorization was limited to one year, and the child was to be returned to Colombia on November 24, 2016. (Verified Petition at¶14 and Exhibit D to Verified Petition; Evidence 1d). Petitioner's testimony was that the time frame acknowledged to immigration was up to the Petitioner, and that he had an option of putting "indefinitely", "two months", "three months",' "a year", "two years", "ten years" or "forever." This testimony was not rebutted by Respondent, who accompanied the Petitioner to the immigration office. Things did not go according to plan, and within days of the Respondent traveling to the United States with the child in November of 2015, Respondent expressed little to no interest in contacting or communicating with Respondent, even refusing to speak with him at times. Respondent admitted on direct examination to periodically blocking the Petitioner's contact through What's App. Respondent further admitted at trial that she had begun a relationship with another man in October, 2015, while she was in the United States on one of her lengthy visits, prior to the child's arrival in the United States.

Respondent failed to provide Petitioner with any immigration information nor information regarding a visa for Petitioner to travel to the United States. Respondent admitted at trial that she

---

[1] In an effort to prevent international child abduction, Colombia has implemented additional exit procedures for Colombian or dual-national children under 18 who are departing the country without both parents or a legal guardian. Upon exiting the country, the person traveling with the child (or the child him/herself) must present a copy of the child's birth certificate, along with written authorization from the absent parent(s) or legal guardian.

made no attempts at assisting Petitioner with immigration; and that she knew the Petitioner could not himself obtain an immigration visa to travel to the United States, and that he was relying upon her. They argued about it prior to Respondent leaving for the United States in November of 2015, they argued about it after November 15, 2015, and continued to argue about that fact, which led to these proceedings.

Petitioner discovered the Respondent's relationship with another man shortly *after* Respondent had returned to the United States with the child in 2015, through his use of Facebook. Petitioner immediately began amicable attempts to secure the return of the child to Colombia and/or to see his child, including offering to meet the Respondent in countries other than the United States. Respondent refused all attempts at return of the child to Colombia and refused to meet Respondent in any other country. Petitioner was unable to obtain governmental assistance from Colombia until the one year authorization for travel had expired. (Verified Petition ¶15). Shortly after the one year travel authorization expired in November of 2016, the Petitioner commenced these proceedings in Bogota, Colombia on January 13, 2017 in connection with the Hague Convention, pursuant to Article 8. The attorney responsible to draft the papers at the Colombian Central Authority referred to the one year limitation on the travel for the child, and acknowledged the Respondent's failure to return the child in November, 2016 as obligated to do. (Petitioner's Exhibit 1e).

Respondent was duly notified of these Hague proceedings by letter from the United States Department of State, Acting Branch Chief of Incoming Abductions, specifically Mr. Nathan George, dated May 12, 2017. (Petitioner's Exhibit 1f). In that correspondence, Mr. George requested that Respondent respond to the Hague proceedings initiated by Petitioner in Colombia, and requested alternative dispute resolution methods in an attempt to avoid this very litigation. In response to the

4

United States Department of State, the Respondent stated that she was "***not interest nor obligated***" to return the child to Colombia. She did not discuss the limited one year travel consent provided to the Ministry of Foreign Affairs and Colombian Immigration. Rather, Respondent took the position that she never intended to return the child ever to Colombia, despite the representation to Colombian immigration authorities that she would return the child in November of 2016, which is the absolute condition upon which the child was permitted to leave Colombia with the Respondent. (Petitioner's Exhibit 1g). Respondent, on cross examination, when asked if she had an agreement (before leaving Colombia in November of 2015) to return the child in November of 2016, answered "yes." Respondent herself made a "custody determination" when Petitioner requested that the child be returned and, according to Respondent's trial testimony, she told him to put the child's best interests above his own desire for custody. Respondent concedes that without Petitioner's consent, the minor child would have been unable to leave Colombia and would be there now, but for her unilateral decision not to return the child despite the agreement.

## II. THE LAW

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." See Convention, pmbl. "The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings." See Hanley v. Roy, 485 F. 3d 641, 644 (11th Cir. 2007). As such, the court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle. Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004).

In order to prove a *prima facie* case under the Hague, the Petitioner must prove through a preponderance of the evidence that the 1) child is under the age of 16;  2) the child was wrongfully removed or retained; 3) from the habitual residence of the child; and 4) it was in violation of custody rights being exercised by the custodial parent.  Article 12 of the Convention provides, that if the commencement of the action is within one year of a wrongful removal or retention, the authority concerned *shall* order the return of the child forthwith. Article 5 of the Convention provides that "rights of custody" shall include rights relating to the care of the person of the child and, in particular, *the right to determine the child's place of residence*; . . .(emphasis added). Next, the Hague Convention is, in part, an international humanitarian treaty, and it is to be broadly construed to give meaning to its general purpose and tenor.  The Court is not bound to order the return of the child if the person...which opposes its return establishes that (a) the person...was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or (b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Art. 13, Hague Convention.  Such defenses, if any, are to be narrowly construed.  Our Eleventh Circuit has specifically emphasized that "narrow interpretations of these exceptions are necessary to prevent them from swallowing the rule and rendering the Convention a dead letter." Thomas v. Orion, No. 2:16-cv-445-FtM-38MRM (M.D. Fla. Dec. 5, 2016). Even when a respondent establishes one or more exceptions, the Court may still order the return of a child, if returning the child would further the aims of the Convention. See Art. 18. See also In re Ahumada Cabrera, 323 F. Supp.2d 1301, 1310 (S.D.Fla. 2004)(holding that "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims

of the Convention," citing <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1066 (6th Cir. 1996)).

Respondent filed her Answer during these proceedings, on September 29, 2017, after one day of trial. Respondent does not assert an Article 13(b) or an Article 20 defense. The Respondent suggests that the child is "well-settled", but the Respondent is not entitled to any consideration of that defense. This Hague proceeding was commenced within one year of the wrongful retention, and an Article 12, "well-settled" defense is not available. <u>Chechel v. Brignol</u>, 2010 WL 2510391 (M.D. Fla. 2010) (establishing that where there is an agreement to travel, wrongful retention begins when the agreed date of return passes). Respondent does assert "affirmative defenses" concerning consent and acclimatization. Respondent asserts that the habitual residence of the child shifted due to the fact that the Petitioner consented to the child obtaining a "green card." Respondent's suggestion in her Answer that Petitioner has visitation rights as opposed to custody rights is not addressed herein, as the Verified Petition was tried by the Court upon the Petitioner's custodial rights in Colombia, which were admitted by Respondent at trial as being 50/50, and which is supported by the law in Colombia, of which this Court has taken judicial notice pursuant to Article 14. The Art. 13 (b) defense was not raised by the Respondent and therefore, cannot be considered by the Court.

The implementing Federal legislation, ICARA, by which the Court is bound, states as follows: "A petitioner in an action...shall establish by a preponderance of the evidence...that the child has been wrongfully removed or retained within the meaning of the Convention. 22 U.S.C. §9003(e)(1)(A). Once a Petitioner meets that burden, ICARA requires a child who has been wrongfully removed or retained to be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." <u>Lops v. Lops</u>, 140 F.3d at 936 (11th Cir. 1998) (citing 42 U.S.C. §11601(a)(4). A respondent who opposes the return of the child has the burden of establishing (A)

by clear and convincing evidence that (there is a grave risk that...return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation or violating fundamental principles of human freedom); and (B) by a preponderance of the evidence that (the petitioner consented to or subsequently acquiesced in the removal or retention of the child). 22 U.S.C.§ 9003(e)(2)(A)-(B). The 22 U.S.C.§9003(e)(2) (A) defense was not raised nor argued, therefore, it cannot be considered by the Court.

Thus, the Court must focus its analysis on whether the Petitioner consented or otherwise agreed to a permanent change of the child's habitual residence from Colombia to the United States and/or whether the child's acclimatization is a useful factor in the case; and if yes, does it overcome the Court's obligation to return the child despite Petitioner's proof at trial of a prima facie case for return to Colombia. Petitioner asserts the answer to all of these questions is clearly "no."

## III. ANALYSIS AND ARGUMENT

There is no dispute that the child was born in Colombia on June 17, 2012 and habitually resided there until November 24, 2015. There is no dispute that even as of November 24, 2016, the child had lived in Colombia more than 3/4 of her four years of life. "Three years and four months" to be exact, as conceded by Respondent on cross examination. The testimony by both parties was that at the time M.A.Y. was taken to Florida in November of 2015, the Petitioner was exercising custody rights, having 50/50 custodial rights with the child in Colombia, sharing expenses for the child, and also being an "excellent dad." Petitioner was listed as the only emergency contact for the child on hospital forms and on school registration forms in Colombia. Respondent's mother testified by affidavit that Petitioner acted as both "mother and dad" during extended visits by Respondent to the United States, leaving the minor child behind in Colombia. There is no dispute between the

parties that the Colombian Immigration laws required that the Petitioner give his consent for the minor child to be removed from Colombia to travel to the United States. There is no dispute that the Petitioner and the Respondent took the child to an immigration office in Colombia to request the necessary travel authorization. Petitioner and child were identified, Petitioner was sworn and provided his fingerprint, and the travel authorization was granted based upon an agreement by the Respondent to return the child in one year, no later than November, 2016.  It is an undisputed fact that the Petitioner began a Hague proceeding in Colombia with the assistance of an attorney at the Central Authority in Bogota, who referred to the one year travel authorization. The Petitioner requested judicial notice of the joint and equal rights of the Petitioner to custody of the child in Colombia, the "patria potestad".   The Colombian "patria potestad" includes the right to make decisions regarding a child's education, well-being, protection, upbringing, and place of residence. It is, therefore, undisputed that Petitioner has rights of custody of the child and was exercising such rights at the time of the move to the United States in 2015 and at the time of the wrongful retention in November of 2016. Petitioner's custody rights include the right to determine the child's place of residence, under Colombian law and the Hague. As such, this case falls squarely within the type of custodial relationship the Hague seeks to protect.  See Lops v. Lops, 140 F.3d 927, 936 (11th Cir.1998)(" The removal of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if the petitioner 'is, or otherwise would have been, exercising custody rights to the child under the country's law at the moment of removal." (quoting Friedrich v. Friedrich, 78 F.3d 1060 (6th Cir. 1996)).


### III.a. TRAVEL AUTHORIZATIONS DO NOT EQUAL SHIFT IN HABITUAL RESIDENCE

Respondent alleges that Petitioner consented to a shift in the Child's habitual residence to the United States. Petitioner maintains that he limited the travel consent to one year because any relocation to the United States was conditioned on his ability to join his family. The one-year limitation on the Child's travel ensured the Child would return to Colombia if he was unable to overcome his visa problems.

Travel authorizations, such as the "Authorization for Permission to Leave the Country Format for Minors" have been considered by this Middle District. In Mendez Lynch v. Mendez Lynch, the court held that an Authorization to Travel, which allowed the children to travel freely, did not indicate that the other parent gave up his legal rights of custody. 220 F. Supp.2d 1347, 1358-59 (M.D. Fla. 2002). There, a father signed a broad Authorization to Travel that allowed the mother to take the children out of Argentina. Id. At 1350. The court held that the "evidence (was) clear that the written consents to travel were given to facilitate family vacation-related travel, not as consent to unilaterally remove the children from Argentina at the sole discretion of the Respondent. Id. at 1358.

In a similar analysis, the Southern District found that a "Permission to Travel," that said nothing about the child permanently moving or relocating to the United States, should not be construed as anything more than permission to travel and return home. Moreno v. Martin, 2008 WL 4716948 (S.D.Fla.). In Moreno, the "Permission to Travel" signed by the father supported his claim that he did not consent to his daughter's removal to the United States, because the document said nothing about the child permanently moving or relocating. Id.

In Asvesta v. Petroutsas, the Ninth Circuit held that the father's time limited (one month) consent for the mother to travel with the child "directly contradicted" a finding that the father

consented to the child's indefinite stay in Greece. 580 F.3d 1000, 1019 (9th Circ. 2009).  See also, Giampaolo v. Ermeta, 390 F. Supp. 2d 1269, 1283 (N.D. Ga. 2004)(for the proposition that Authorization to Travel agreements are typically executed under the guise of allowing the child to travel abroad either for a family emergency or a vacation. They typically state that the child can travel to another country and then return home. As such, they normally will not show that the petitioner consented to a change in the child's habitual residence.)

Here, Respondent could have requested a document which stated "relocation" or "permanent move" to the United States, but she did not. In fact, on cross examination, she admitted that no such documents exist. Petitioner maintains that he could have executed a travel consent for a longer or indefinite period of time, but consciously chose to limit the consent to one year. Therefore, the travel consent is not indicative of Petitioner's consent to a shift in habitual residence.


III.b. <u>PETITIONER DID NOT CONSENT TO SHIFT IN HABITUAL RESIDENCE</u>

Respondent would have this Court believe that Petitioner, knowing he could not travel to the United States, consented to an arrangement of "visitation" with the child that was not at all what the parties had done before in Colombia. The "consent" that Respondent would have this Court believe the Petitioner gave, would have radically restructured M.A.Y.'s life (as well as that of the Petitioner).[2] It is implausible that the Petitioner, having been in a romantic relationship with the Respondent since 2007, and having been the primary custodian for the majority of the child's life, would so quickly and casually give such a consent. In fact, Petitioner did not so consent. Respondent

---

[2] Undersigned counsel submits that Respondent's actions have radically altered Petitioner's life without his consent; and that a return to the status quo prior to the wrongful retention is mandated by the Hague.

neither argued, nor can point to any Colombian law, order, or agreement which ever terminated Petitioner's co-equal right to determine the child's country of residence. An exception, if any, would be applied narrowly. There is a complete absence of evidence, let alone a preponderance of same, that Petitioner consented to a change in habitual residence of the minor child.

By Respondent's very own admission in a message she left Petitioner on "WhatsApp," she acknowledged that she lied to the Petitioner about the travel consent form; and she further acknowledged that he was upset by her actions. Notably, Respondent stated, "Because having signed that consent is eating you up. It's eating you up that I lied for you to sign. And not even a lie! Cause what? We were supposedly a happy family." (Petitioner's Exhibit 5). After learning of Respondent's deceit, Petitioner began taking consistent and vigorous, prompt action, to seek the return of the child. These actions included more attempts to obtain a visa, offers to meet in countries other than the United States, and his prompt action in filing the Hague action through the Central Authority in Bogota, Columbia after the wrongful retention, all of which are not in dispute and are also inconsistent with consent. Respondent's theory of Petitioner's consent is contradicted by Petitioner's testimony and actions; and it defies the evidence and the verbal testimony and admissions of the Respondent. Most importantly, it directly contradicts the agreement made with the Colombian immigration authorities. It is impossible to comprehend that Petitioner would consent to permanently change the habitual residence of the child, when the travel to the United States was limited to one year, and also when doing so would have resulted in a situation that Petitioner has fought against since at least since December of 2015, one month after Respondent arrived with the child in the United States. Petitioner never consented to a permanent change in the habitual residence of the

child from Colombia to the United States.[3]

In February of 2017, this Middle District's Jacksonville Division considered the case of Cunningham v. Cunningham, No. 3:16-cv-1349-J-34JBT (M.D. Fla filed February 17, 2017). The couple in that case developed a relationship in Japan, where the father, a U.S. citizen, was stationed in the Army. Despite a language barrier, they married in 2014. The couple had relationship difficulties, but nonetheless agreed to move to Maryland, where the father became stationed in 2015. The mother, a Japanese citizen, and her son from a prior relationship obtained permanent resident "green cards" in the United States. The entire family moved into housing on the Army base in Maryland. The relationship became so turbulent that the mother, while pregnant, returned to Japan with the assistance of the father. The court focused on what the mother and father intended when the Japanese mother, pregnant with the child, left the United States for Japan. Although factually intensive and factually somewhat disparate from the case at bar, the permanent residency status did not preclude the Middle District from determining that there had not been a settled intent of the parties to shift the habitual residence to the United States. In so reasoning, the court concluded that the mother's move to the United States was conditioned upon the parties' reconciliation, which did not occur. Indeed, the court concluded that the mother never formed a settled intention to abandon Japan, despite her becoming a permanent resident in the United States. Lastly, the court concluded that the father's retention of the child in the United States was a sudden departure from the parties' prior understanding. In the case at bar, the parties' clear, unequivocal understanding was that the

---

[3] Petitioner notes also that the Respondent obtained her "green card" in 2013; the travel authorization limiting the child's travel to one year (through November of 2016) was executed in November, 2015, more two years after the Respondent's receipt of her "green card" and after the child's "green card" status was approved. The "green cards" do nothing to negate the one year return commitment.

child, M.A.Y., would be returned to Colombia in November, 2016.

Petitioner requests that this Court also consider the unpublished decision of the Honorable Justice Elizabeth Kovachevich, in Mustafa v. Munoz, 8:17-cv-49-T-17AEP (M.D. Florida filed February 10, 2017). Therein, the parties had an agreement similar to the agreement between the parties at bar. According to the Petitioner therein, the plan was for the Respondent and the child, who were citizens of both the United States and Sweden, to travel from Sweden to the United States. The Respondent would thereafter initiate a visa application for Petitioner, who was a Swedish citizen. Once the visa application was complete, the Petitioner alleged that she planned to join her son and husband in the United States to live as an "intact family unit." Approximately three weeks after arriving in the United States, the Respondent notified the Petitioner that he was seeking a dissolution of marriage and that she should not travel to Florida, and that he would be keeping the child in the United States. After trying amicable methods of return, the Petitioner filed a Hague proceeding in Sweden. [4] Judge Kovachevich concluded that the parties' testimony demonstrated that at the time of removal of the child to the United States, the parties understood that the Petitioner, Respondent and child would return to being a unified family unit upon completion of the Petitioner's immigration process to the United States. This Court also concluded that it was not until the child had been removed to the United States that the plan changed, *and as a result of that plan changing, the Petitioner could not be deemed to have consented to the removal or retention of the child under the current state of affairs*. Judge Kovachevich also determined that Petitioner's actions in filing the Hague demonstrated that she had not acquiesced to the retention of the child in the United

---

[4] Undersigned counsel was retained by the Swedish government to file the case on behalf of the Petitioner.

States, and the child was promptly returned to Sweden.

In light of the foregoing and the testimony adduced at trial, Respondent has failed to prove, by a preponderance of the evidence, that Petitioner consented to a change of the child's habitual residence.

### III.c. CHILD'S PERMANENT RESIDENCY DOES NOT EQUAL SHIFT IN HABITUAL RESIDENCE

Respondent argues that because the Petitioner knew about the "green card" process for the child, that he consented to a permanent relocation of the child, which shifted the change in the habitual residence of the child.   However, this argument has been fully vetted and rejected in the Southern District of Florida case of Moreno v. Martin, 2008 WL 4716958 (S.D. Fla.).  In that case, the Court found that "green card" status is not evidence that a child is "well-settled."  In Moreno, the unmarried parties began co-habitating in Spain in 2004, and the child was born in 2005. Id. at 3. On February 1, 2007, the parties separated, but did not execute a custody agreement. Id. However, the father did execute a "Permission to Travel" form, which was prepared by a Spanish notary. Id. As in the case at bar, the mother alleged that the petitioner "always knew" that she intended to move permanently with the child to the United States after the separation, and that the Permission to Travel was evidence of his agreement to the permanent relocation.  Id.

The parties in Moreno sharply disagreed as to the remainder of the events relating to the separation and the agreement relating to the child. Id. at 4. The mother's testimony was that the father knew about the permanent relocation because she told him. Id. at 5. The father testified that he only intended for the child to travel to Florida for a short time to visit her uncle. Id. As soon as

15

the father was made aware of a change in plans relating to the trip to the United States, he began phoning his attorney, phoning the police, and requested that the Spanish authorities assist him. Id. The father filed a Central Authority "Request for Return," in March of 2007. Id. Similar to the case at bar, there was a significant delay in the transmittal of the Request for Return to the United States Central Authority, but eventually it made its way to the Department of State.[5] Id.

The Southern District acknowledged the Spanish "patria potestad" in determining that the father had custody rights and was exercising same at the time of the child's wrongful removal. Id. at 8. In so doing, the court recognized that the concept of "patria potestad" was derived from ancient Roman law and exists in many civil law countries. Id. at 9. It provides for the joint exercise of parental authority, and stands for the proposition that an unmarried father possesses custody rights where there is no judicial custody determination or formal custody agreement. Id. (citing Whallon v. Lynn, 230 F.3d 450 (1st Cir. 2000)).

The central dispute in Moreno was whether or not the father consented to the permanent relocation to the United States. Id. at 10. The Moreno Court, citing a plethora of prior case law, held that in examining consent defenses, the courts must consider "whether the petitioning parent 'harbored a *subjective* intent to permit the respondent 'to remove *and* retain the child for an indefinite or permanent time period.'" Id. In considering the Permission to Travel form, the court concluded that had the father actually had a subjective intent to permit the child to permanently relocate, he would not have taken prompt action in attempting to secure her return. Id. at 12. Further, the Permission to Travel was considered by the court to be just that and nothing more: a permission

---

[5] The Central Authority for the United States changed to the Department of State on April 1, 2008.

to travel. Id. The court found that the travel permission slip supported the father's testimony, in that it stated nothing about the child moving permanently or a permanent relocation to another country. Id.

The Moreno court reviewed the actions of the father post- removal, and concluded that all of the actions of the father subsequent to the removal of the child supported his testimony, in that the actions were completely inconsistent with consent to a permanent move. Id. As in the instant case, the only evidence of the purported "consent" was the mother's testimony. Id. at 13. The court found it "unimaginable" that the father would tell the mother to permanently relocate and not return to Spain, when doing so would have completely controverted the *very remedy* that the father had been seeking for 18 months at that time- *the return of the child to Spain pursuant to the Hague*. Id. at 16.

**The Southern District in Moreno also declined to consider immigration status as a significant factor in deciding whether or not the small child was well-settled.  Id. at 22. Instead of finding permanent residency status as evidence of the father's consent, the Court determined that the status alone suggests little about the child's "significant connections," and it was noted that permanent residency status is no guarantee to future U.S. citizenship.**[6] Id. at 22. (emphasis added).

Analogously, Petitioner argues that a "green card" does nothing to shift the habitual residence of the child. With the "green card", the child is permitted multiple entries and exits from the United

---

[6]  Petitioner argues that the "well settled" defense is not available to Respondent in our case; however, the analysis to purported acclimatization is very similar.  In addition to the declination to consider the permanent resident status as significant, the court remarked also that the child had lived in five different residences in only 18 months, similar to our fact pattern.

States. 8 C.F.R. §211.3. The child can travel freely back and forth from the United States for periods of time up to one year, so long as there is a legitimate purpose. 8 C.F.R. §211.3. Further, the "green card" status for both the Respondent and child was obtained *prior* to the travel consent being signed which obligated the Respondent to return the child by November, 2016, signaling that the limited travel consent supersedes and encompasses the final agreement of the parties. Petitioner also points out that, despite being requested to produce immigration documents at trial that would support Respondent's position, she produced no documents other than a copy of the Respondent's "green card" and the child's "green card." Respondent produced no immigration documents or otherwise to indicate that the Petitioner ever even participated in the immigration process, nor that he knew anything about the formal immigration process. The only evidence supporting the Respondent's theory is her own self-serving testimony, which is inconsistent on its face. For example, when questioned on cross examination about her refusal to agree to mediate the Hague proceeding, Respondent swiftly responded that she had communicated constantly and many times with Petitioner about these matters. She stated that she had told him to reconsider, and asked him to come to an agreement. In response, Respondent testified, Petitioner would abruptly protest and exclaim that he wanted the child back in Colombia. One can only wonder if there was already an agreement, why she would need to ask him to "come to an agreement." Nonetheless, Respondent's own testimony clearly indicates the mind set of the Petitioner, and completely contradicts her position.

The purported "consent" to shift the habitual residence was never given by Petitioner and never reduced to writing, even though Respondent had an opportunity to do so at the immigration office in Colombia, if that had truly been the case. Respondent's testimony that Petitioner took the child to a medical examination is unavailing. She further testified that "I told him that it was very

important for him to take her that should could not miss that appointment. I told him that", which translates simply to this: When Respondent said "Jump", Petitioner said "How high?"

III.d. <u>RESPONDENT ADMITS AGREEMENT TO RETURN AND WRONGFUL RETENTION</u>

At trial, Respondent admitted that she had agreed to return the child in November of 2016, albeit for a "visit." She also admitted that she wrongfully retained the child in defiance of the agreement because of a vague, uncorroborated threat from Petitioner. Therefore, she intentionally disregarded and interfered with the normal exercise of Petitioner's joint custodial rights in Colombia by ignoring the agreement to return to Colombia. That admission constitutes Respondent's commission of a "wrongful retention" within the meaning of the Hague Convention. See <u>Ozaltin v. Ozaltin</u>, 708 F.3d 355, 368-70 (2d. Cir. 2013). Moreover, this alleged threat does not provide a basis for Respondent to retain the child under the Hague Convention. Respondent's unsubstantiated allegation of a threat is also contradicted by her own testimony in which she cited wanting the child to have a better life in the United States as reasoning for not returning the child to Colombia.

ICARA also establishes that a removal or retention is wrongful when it occurs before the entry of a custody order. 42 U.S.C. §11603 (f)(2). Respondent herein also acknowledges that the parties signed no agreement regarding custody of the minor child, M.A.Y., and that no court has yet entered any order regarding custody. Respondent admits to wanting to initiate a custody proceeding in the United States, but testified she did not have the financial wherewithal to do so. [7] The child was

---

[7] Petitioner argues that such an action is inappropriate in that the child's habitual residence is Colombia for purposes of the Hague; and the child's residence would be Colombia for purposes of any UCCJEA action; that periods of temporary absence do not confer jurisdiction upon a court for purposes of either the Hague or the UCCJEA.

in the United States with Respondent only by an agreement of the parents for the child to be in the United States for one year. The child's retention in the United States beyond November, 2016 was wrongful under the Hague Convention and pursuant to ICARA. Respondent's motives are obvious and her actions completely undermine the purposes and tenor of the Hague Convention. "By seeking sole custody over the children outside their state of habitual residence then, the (father) 'disregarded the rights of the other parent which are also protected by law, and interfered with their normal exercise.'" Mozes v. Mozes, 239 F.3d at 1084.

II.e. THE CHILD IS NOT ACCLIMATIZED NOR DOES ACCLIMATIZATION OVERCOME THE PROPRIETY OF RETURN

Finally, while the Respondent argues that the child has become acclimatized, the following facts are undisputed by Respondent: 1) the child, at 4 years of age, had spent more than 3/4 of her life in Colombia at the time of the wrongful retention; [8] 2) the child speaks both English and Spanish fluently; 3) the child was cared for, nourished by and loved by maternal and paternal family both in Colombia and in the United States; 4) the child participated in religious activities in both Colombia and in the United States; [9] 5) the child was in day care/preschool in both Colombia and the United States; and 6) the Respondent has lived in at least three residences in three different cities since

_____

[8] It is questionable under the case law in the Middle District and Eleventh Circuit whether a child of MA.Y.'s age even has the developmental capacity to engage meaningfully in any social activities such that the child would be acclimatized. The Petitioner argues that a four year old is not old enough to experience meaningful ties to the United States.

[9] Petitioner argues that any consideration of these types of social contacts made after the date of wrongful retention is inappropriate.

being in the United States with the child.  In fact, Respondent and child, after moving three times, are currently living in the home of Respondent's boyfriend. There was no evidence presented by the Respondent that the minor child has any connections with the United States such that a return to Colombia would be harmful or disruptive. Contrarily, the evidence relating to the reunification of the Petitioner with the child in the United States as the result of these proceedings shows unequivocally that the child remains completely devoted to the Petitioner. Petitioner argues that any alleged attachment or acclimatization to the United States would come only at the cost of any relationship between the child and Petitioner, [10] as shown by the actions of Respondent over the last two years and her response to our Department of State.

The Ninth Circuit, in the landmark decision of <u>Mozes v. Mozes</u>, elucidated an analytical framework it hoped would make the determination of habitual residence, and consequently the concept of acclimatization, more consistent. 239 F.3d 1067 (9th Cir. 1999). That Court concluded that "the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." <u>Id.</u> at 1075. The Ninth Circuit focused on the parental intent, rather than focusing on the child, determining that children most often lack the material and psychological wherewithal to decide where they will reside. <u>Id.</u> at 1076.  When the parents do not agree, which is often the case, the Court must consider the factual circumstances. <u>Id.</u> The <u>Mozes</u> court provided for three general categories of cases where parents disagree as to the child's residence.  <u>Id.</u> The case at bar represents the second category of cases recognized by the <u>Mozes</u> Court: that which encompasses situations where the child's move was only meant to be for a specific period, but one parent changes

---

[10] Petitioner notes that at the time of these proceedings, he had not physically seen his child in nearly two full years.

their mind and decides to remain. Id. at 1077. Here, courts tend *not* to find that a changed mind of

only one parent changes a child's habitual residence. Id. Moreover, even an undisputed settled intent

between the parents is not sufficient to change the habitual residence.  Id. at 1081.  Enough time

must have passed to permit the child to acclimatize to his or her new location.  Id. However, the

Mozes Court was quick to instruct that "courts should be slow to infer" that a child's acclimitization

to his surroundings has in fact resulted in the abandonment of the prior habitual residence. Id. at

1079. Permitting an acclimitization argument to persuade the Court would undermine the entire

purpose of the Convention and actually promote child abduction by increasing the incentive to try.

Id. The Mozes case instructs that: when there is no shared settled intent on the part of the parents to

abandon the child's prior habitual residence, a court should find a change in habitual residence only

if the objective facts point unequivocally to a new habitual residence, or if the court could "say with

confidence that the child's relative attachments to the two countries have changed to the point where

requiring a return to the original forum would now be tantamount to taking the child out of the

family and social environment in which its life has developed." Id. at 1081.

   In Holder v. Holder, the Ninth Circuit revisited and expanded its holding in Mozes. 392 F.3d

1009 (9th Cir. 2004). The Holder case involved a military family with two young children, who

moved from the United States to Germany for a four-year assignment. Id. at 1012. Eight months after

arriving in Germany, the mother traveled to the United States with the children and did not return.

Id. The father petitioned under the Convention for the children's return to Germany. Id. In

determining the children's habitual residence, the Ninth Circuit first restated the standard it presented

in Mozes. Id. at 1015. The court held that the parents never formed a settled intent to abandon the

United States as the children's habitual residence, placing great weight on the specific, delimited

period that the family planned to spend in Germany. Id. at 1018. The court discounted objective indications of residence that other circuits consider determinative. Id. Additionally, the court elaborated on the issue of acclimatization, finding that the critical question is whether the child's life is firmly rooted in their new surroundings. Id. at 1019. However, the court noted that children can take part in daily life while understanding that one has another life to go back to and that, therefore, the children's eight months in Germany did not overcome the lack of parental intent to abandon the United States. Id. at 1021.

In 2004, our Eleventh Circuit adopted the Mozes reasoning in the case of Ruiz v. Tenorio, where a U.S. couple and their two children moved to Mexico. 392 F.3d 1247 (11th Cir. 2004). The testimony at trial was conflicting as to whether the father intended it to be a permanent move. Id. at 1249. The father took a job in Mexico, the family began building an "American-style" home, the children were in school, and they had friends. Id. at 1249-1250. The couple had marital problems all during the time they were in Mexico, nearly three years. Id. The parties eventually separated in Mexico, but the mother remained there with the children for another six months before removing them to the United States. Id. Our Eleventh Circuit concluded that the habitual residence had never changed to Mexico, in that the parents had not formed a settled intent to abandon the United States as the children's habitual residence. Id. 1254. The crux of this conclusion stems from the fact that the move was conditional, and intended to salvage the marriage. Id. at 1255. In addition, the Court concluded that the children, despite being in Mexico for three years, had not acclimated to Mexico to overcome the parents' lack of shared intent, such that returning the children to the United States, would now amount to taking them out of the family and social environment in which their life had developed. Id.

Similarly, in <u>Mikovic v. Mikovic</u>, the Eleventh Circuit was confronted with the unusual issue of a parent who was deported for overstaying his visa in the United States. 541 F.Supp.2d 1264 (M.D. Fla. 2007). His American wife and child were left behind in the United States. <u>Id.</u> at 1266. The American wife agreed to sell the home they had in the United States to be able to move to Wales with the child and live as an intact family. <u>Id.</u> at 1268. The wife applied for and received residency status in Wales, enrolled the child in day care, participated with the Husband in leasing a home, and applied for and received subsidized government health care. <u>Id.</u> at 1268-1270. One year later, unable to resolve the marital conflicts, the American wife surreptitiously removed the child from Wales and returned to the United States. <u>Id.</u> at 1272. The Court reasoned that it should review the habitual residence in light of the couple's larger social history. <u>Id.</u> at 1279. The Court ultimately concluded that despite the Wife obtaining residency in Wales, that the parents had never formed a settled intent to change the child's habitual residence. <u>Id.</u> at 1280. In fact, the Court concluded that the mother had intended the move to Wales to be ***contingent*** upon the improvement of the marriage, and that had not occurred. <u>Id.</u> The father's suggested "acclimatization" of the child to the United Kingdom was determined insufficient to place the child's habitual residence in Wales as opposed to the United States, despite the passage of one year and despite the deportation of the father from the United States to the United Kingdom. <u>Id.</u> at 1282.

In the instant case, evidence of acclimatization was extremely limited, consisting of testimony that the child goes to school and has friends. Given the child's tender age of five, one can hardly render these contacts meaningful to the extent they would override the Convention's preference for return. This Middle District Court has previously recognized that acclimatization is based on a showing that the "child has no appreciable connection to his previous residence." <u>Botello</u>

De La Riva v. Soto, No. 2:15-cv-615-FtM-29MRM (M.D. Fla. 2016)(citing Seaman v. Peterson, 762 F. Supp. 2d 1363, 1377-78 (M.D. Ga. 2011), aff'd, 766 F.3d 1252 (11th Cir. 2014).  Respondent has made no such showing, and Petitioner's reunification with the child during these proceedings is evidence to the contrary. (Petitioner's Exhibit #7).

Furthermore, Petitioner argues that a decision not to return this child to Colombia is tantamount to a custody decision. Petitioner cannot travel to the United States. Respondent is able to travel back and forth freely to Colombia, as is the child.  Despite being in the United States since November, 2015,  the Respondent has failed to return to her country of citizenship, despite her obligation to do so pursuant to the Colombian Authorization for Permission to Leave the Country for Minors. [11] (Petitioner's Exhibit 1d). Despite her incredible testimony that she intended to allow summer "visitation" for Petitioner with the child, [12] there is no evidence that Respondent has ever attempted to arrange the same. On the contrary, Respondent advised the United States Department of State in May of 2017 that she had "*no interest nor no obligation*" to return the child ever to Colombia. (Petitioner's Exhibit 1g).  Respondent testified that she wished to begin custody proceedings in the United States, despite knowing that Petitioner could not defend himself, in part, because he cannot travel freely to the United States. Respondent's testimony regarding her illusory offers of summer "visitation" are belied by her own actions.  She refused  to take the child in the

---

[11]  Petitioner submits that Respondent has refused to return to Colombia in that she knows that her actions are unlawful in Colombia, in that the parents had an agreement that she would return. Undoubtedly, Colombia would view Respondent's actions as an illegal retention of the child. Although this issue is not before the Court, it merits comment.

[12]  Respondent unilaterally determined that Petitioner should have "visitation" rights as opposed to joint, 50/50 custody, which she admitted Petitioner has in Colombia.

summer of 2017 to visit the Petitioner, knowing that these proceedings had been initiated in Colombia and had reached our Department of State. On cross examination, Respondent's excuses as to financial considerations is inconsistent with her prior travels to the United States at least four times since 2013, and the fact that she is currently gainfully employed. The evidence presented by Respondent suggests that Petitioner is not listed on any registration forms relating to enrollment of the child in school during the 2017-2018 school year. Although the testimony was disputed as to how frequently the Petitioner has electronic access with the child, Petitioner argues that Respondent's testimony is not persuasive as to the amount of electronic access given the child. Respondent provided no evidence for the Court to consider which showed any acknowledgment by Respondent of the Petitioner's rights to the child when communicating with any authority in the United States, including the response to the Department of State, in which Respondent felt no obligation to ever return the child to Colombia. The record reveals affidavits from process servers, indicating Respondent attempted to evade service and deny Petitioner this legal recourse. At trial, Respondent argued lack of notice of these proceedings, completely ignoring the fact that she had been notified of these proceedings by the United States Department of State in May of 2017. In sum, all of Respondent's actions point toward a unilateral decision to interfere and obstruct Petitioner's joint rights to both custody and access with the child.

III.f. RESPONDENT'S POSITION LACKS CREDIBILITY

The Respondent alleges in her pleadings and in her sworn testimony that she broke off her relationship with the Petitioner by telephone from the United States in August of 2015. However, the testimony and evidence adduced at trial demonstrates that the Respondent traveled back to

Colombia on October 31, 2015, and continued to have an intimate relationship with the Petitioner through the date that she moved back to the United States with the child on November 24, 2015. Specifically:

On November 11, 2015, Respondent sent the following messages to Petitioner:

"I already told Manuela that we should go bathe, and she says "no", that we should wait for you so we can go bathe." (Petitioner's Exhibit 6q).

On November 5, 2015, Respondent sent the following message to Petitioner:

"Sweetie, what's taking you so long?" (Petitioner's Exhibit 6p).

On October 31, 2015, Respondent sent the following message to Petitioner:

"Good morning, my beautiful love! How are you this morning? My sweet" (Petitioner's Exhibit 6m).

On October 30, 2015, Respondent sent the following message to Petitioner:

"Oh my love, I already left to go to work. I am already working. I love you a lot." (Petitioner's Exhibit 6l).

On October 30, 2015, Respondent sent the following message to Petitioner:

"Hello, hello! Oh my God! We're finally going to see each other already! I am so nervous. I am so anxious to see you...(plural) to hug you....(plural)...to touch you (singular)." (Petitioner's Exhibit 6k).

The Respondent's October 30, 2015 message (Petitioner's Exhibit 6k) is one day prior to her departure back to Colombia to get the child and to obtain the Petitioner's consent for the child to travel.

Also, in the "WhatsApp" voicemail, Respondent refers to the parties as a happy family when

27

Petitioner signed the consent, contradicting her trial testimony that they were separated. (Petitioner's Exhibit #5). Furthermore, on cross-examination, Petitioner admitted to being intimate with Petitioner in Colombia during November of 2015, because he would not sign the consent otherwise. That admission supports the Petitioner's contention that he had a subjective belief that they would remain a family, and that he did not relinquish his custody rights or consent to a shift in the Child's habitual residence. Petitioner had discovered the existence of the Respondent's new boyfriend in December of 2015. However, at trial, the Respondent admitted having begun the relationship as early as October, 2015, *prior* to her return to Colombia to get the child. Petitioner testified that Respondent's confession during trial made him disillusioned. He testified that he would never had signed the travel authorization had he known the Respondent had already begun a new relationship in the United States. It is incredulous to believe the assertions of the Respondent. To wit: Respondent would have this Court believe that she broke up with the Petitioner over the phone in August of 2015; and despite him being an "excellent dad;" despite him wanting to be an intact family; despite him having impossible visa problems; and despite him being unable to travel to the United States without assistance; that Petitioner would agree to a permanent relocation of the child, and even drive the child to the airport with a smile on his face. (Petitioner's Exhibit 11). Respondent's own testimony was that the parties argued about the visa problems before November 2015, during the one year prior to the wrongful retention, and afterward. On direct examination, Respondent admitted that when she offered summer "visitation" to the Petitioner after being in the United States, he "got aggressive and he would say no, I want my daughter here (in Columbia)." Respondent offered no proof of any formal act nor any proof of any written renunciation of Petitioner's joint and equal rights to the minor child. This Court must, in making its determination as to whether there was

consent to a change in habitual residence, consider the *subjective* mind set of the Petitioner concerning these matters. Mozes v. Mozes, 19 F.Supp.2d 1108 (C.D. Cal. 1998). The Court must consider whether the Petitioner "harbored a *subjective* intent to permit the respondent to 'to remove *and* retain the child for an indefinite period or permanent time period.'" Moreno v. Martin, 2008 WL 4716948 (S.D. Fla.), citing Baran v. Beaty, 479 F.Supp.2d 1257,1267 (S.D.Ala.2007). The only proof of Petitioner's subjective intent is that the child was to be returned to Colombia in November of 2016; and Petitioner has made valiant efforts to enforce that agreement since the wrongful retention. In order to accept Respondent's testimony as to the agreement, one would have to ignore the four corners of the travel authorization and believe that an admittedly involved father readily relinquished rights to the child that he raised practically alone for more than the first three years of her life.

## IV. CONCLUSION

The Petitioner appreciates the acknowledgment of this Court that the child is obviously loved by both parties, and recognizes that any decision by this Court will result in a heartbroken parent. The Petitioner acknowledges that the child has spent two years in the United States and has developed relationships in the United States. Respondent testified on cross examination, that her concern was the "best interest" of the minor child. The Petitioner respectfully argues that the Court is prohibited from considering the "best interest" of the child and must focus on the Convention and case law interpreting the Convention, keeping in mind the purposeful goal of consistent rulings among the Courts. Based upon the facts of this case and the absolute one year agreement to return the child to Colombia no later than November of 2016,  Petitioner respectfully requests that this

Court order the prompt return of M.A.Y. to Colombia pursuant to the Hague Convention and our obligation to recognize the goals of that treaty.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic filing to Kathleen Krak, Attorney for Respondent, on this ____ day of October, 2017.

Carmen R. Gillett, Esq.
Florida Bar No. 0375446
**CARMEN R. GILLETT, PLLC**
1845 Morrill Street
Sarasota, FL 34236
Phone: (941)366-9826
Fax: (941)366-9811
Attorney for Petitioner