UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHAN SEBASTIAN ALZAT CALIXTO,

     Petitioner,

v.                                                                          Case No: 8:17-cv-2100-T-33JSS

HADYLLE YUSUF LESMES,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the Verified Petition for Return of the Child to Colombia ("Petition") (Dkt. 6), and Respondent's Verified Answer and Affirmative Defenses (Dkts. 38, 40). On September 26 and October 2, 2017, the Court held an evidentiary hearing on the Petition, after which the parties filed their memoranda of law (Dkts. 47, 48). For the reasons that follow, it is recommended that the Petition be denied.

## BACKGROUND

Petitioner, Johan Sebastian Alzate Calixto, brings this action for the return of a child under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011. Petitioner alleges that Respondent, Hadylle Yusuf Lesmes, wrongfully retains their minor child, M.A.Y., in Florida and requests that the Court order M.A.Y. to be returned to Colombia.

In his legal memorandum, Petitioner argues that Respondent has unlawfully retained M.A.Y. in Florida since November 2016. (Dkt. 47.) He argues that while he consented to M.A.Y. coming to the United States with Respondent, his consent was conditioned on his ability to join

them in the United States and was limited to one year.  Thus, he argues, upon expiration of his

consent in November 2016, Respondent made the unilateral decision to retain M.A.Y. in the

United States, which constitutes a wrongful retention under the Hague Convention.

In response, Respondent contends that the parties shared the intent for the United States to

become M.A.Y.'s habitual residence, as evidenced by Petitioner's support of and help with

M.A.Y.'s application for permanent United States residency.  (Dkt. 48.)  This shared intent,

Respondent argues, cannot be changed by Petitioner's unilateral desire for M.A.Y. to return to

Colombia because his travel visas to the United States were denied.  Thus, Respondent argues that

the United States is M.A.Y.'s habitual residence and, therefore, the Petition must be denied

because Petitioner cannot establish a prima facie case for wrongful retention under the Hague

Convention.

### FINDINGS OF FACT

Petitioner, Respondent, and M.A.Y. were all born in Colombia (Pet. Exs. 1C, 1M–1P), but

Respondent and M.A.Y. are permanent residents of the United States (Resp. Exs. 1–3).  Petitioner

lives in Colombia, while Respondent and M.A.Y. live in North Port, Florida.  In 2007, while living

in Colombia, Petitioner and Respondent became romantically involved.  Petitioner testified that

he and Respondent lived together off and on for the first five years they dated, while Respondent

testified that she lived with her mother and lived with Petitioner only briefly in 2014.  In 2011, the

parties learned that Respondent was pregnant, and Respondent gave birth to M.A.Y. on June 17,

2012. (Pet. Ex. 1C.)  M.A.Y. lived in Colombia until she was little over three years old.  (See Pet.

Exs. 1H, 1L.)  Petitioner and Respondent enrolled M.A.Y. in nursery school in Colombia, which

she began in January 2015, and Petitioner is listed as the school's emergency contact for M.A.Y.

(Pet. Ex. 1H.)

- 3 -

Respondent has several relatives, including her father, who are permanent residents of the United States. She testified that she has always intended to become a United States permanent resident and to live in the United States, which she has made clear to Petitioner since they met. Respondent's father testified that he sponsored Respondent's petition for permanent residency in the United States in approximately 2000, and Respondent was granted United States permanent residency in August 2013 (Resp. Ex. 2). To maintain permanent residency, Respondent made at least three trips to the United States since August 2013. There was conflicting testimony as to who M.A.Y. lived with while Respondent was in the United States. Petitioner testified that M.A.Y. lived with him during Respondent's trips. Respondent, however, testified that M.A.Y. lived with Respondent's mother during her trips to the United States, although Petitioner lived with Respondent's mother during Respondent's last trip to the United States.

Petitioner testified that he understood that the purposes of Respondents' trips to the United States were for Respondent to maintain her permanent residency in the United States. He testified further that he and Respondent shared the goals of attaining United States permanent residency for M.A.Y. and living together as a family in United States. Respondent initiated M.A.Y.'s application for United States permanent residency in 2013. Petitioner testified that he participated in M.A.Y.'s application for United States permanent residency, including taking her to a medical examination in October 2015 that was a mandatory part of the application. Although he testified that he was not present at M.A.Y.'s final interview for approval of her permanent residency, he testified that he was aware of the interview and believed it to be part of his plan with Respondent for them to live as a family in the United States. Respondent testified that she, M.A.Y., and Petitioner were present at M.A.Y.'s final interview in her application process.

M.A.Y. was granted United States permanent residency on November 24, 2015.  (Resp. Ex. 1.)  On that date, Respondent and M.A.Y. left Colombia and flew to Florida with the intention of residing in Florida with Respondent's uncle.  Petitioner, along with family members on both sides, bade Respondent and M.A.Y. farewell at the airport in Colombia.  (Pet. Ex. 1L.)  Petitioner testified that this was a happy occasion because he anticipated "a new beginning" in the United States, and that Respondent told him that the purpose of this trip was for her to do the appropriate paperwork to allow Petitioner to live in the United States.

Petitioner's and Respondent's testimony conflicts regarding the status of their relationship from the time M.A.Y. was born through Respondent's and M.A.Y.'s November 2015 departure from Colombia to the United States.  Petitioner testified that the two broke up only once and briefly in August 2015, but that the two were together at the time Respondent and M.A.Y. traveled to the United States in November 2015.  Respondent testified that she and Petitioner were a couple for five years before M.A.Y. was born, were a couple on and off after M.A.Y. was born, lived together shortly during 2014, and that she ended the relationship in August 2015, a few months before she and M.A.Y. left Colombia for the United States.  Respondent testified that she and Petitioner have not been romantically involved since August 2015 and that she previously informed Petitioner that they are no longer a couple.

Before Respondent's and M.A.Y.'s November 2015 departure from Colombia, Petitioner executed a form with the Ministry of Foreign Affairs of Colombia, which stated that he authorized M.A.Y. to leave Colombia in November 2015 with Respondent to travel to the United States and return one year later, in November 2016 ("Consent").  (Pet. Ex. 1D.)  Respondent testified that, without this executed Consent, M.A.Y. could not leave Colombia.  Petitioner testified that his authorization could be granted for any length of time or an indefinite length of time, and that he

understood the Consent to mean that if he was unable to reside in the United States, then M.A.Y. would return to Colombia in November 2016.  On the other hand, Respondent testified that she and Petitioner agreed that M.A.Y. would visit Petitioner in Colombia in November 2016. However, M.A.Y. has not returned to Colombia because, according to Respondent, Petitioner has threatened to keep M.A.Y. in Colombia upon her arrival there.  Petitioner denies making this threat.

According to Petitioner, Respondent began acting emotionally distant from him upon her arrival in Florida in November 2015.  He testified that he spoke to M.A.Y. briefly on the day she arrived in Florida and that within a week of being in Florida, Respondent made it clear to Petitioner that she did not want a relationship with him.  Becoming worried, Petitioner went to the Central Authority in Colombia to request aid in having M.A.Y. returned to Colombia, but Petitioner testified that he was instructed to wait for the Consent to expire to begin the petition process. Petitioner testified that he pleaded with Respondent for the family to unite in Canada or at least visit in Panama or Mexico.  While Petitioner testified that his communication with M.A.Y. was not always facilitated by Respondent, the evidence shows that Petitioner has almost daily contact with M.A.Y. through phone calls, messaging, and videoconferencing on a phone application. (Resp. Ex. 12.)

Petitioner testified that while Respondent and M.A.Y. have been in the United States, Respondent has not provided him with documentation to apply for permanent residency or other types of visas to the United States.  Petitioner testified that Respondent's lack of assistance was contrary to Petitioner's and Respondent's agreement that Respondent would petition for Petitioner's ability to live in the United States so that the three could live together in the United States as a family.  Petitioner applied for, but was denied, tourist visas to the United States.  When he informed Respondent of being denied a visa for the fourth time in December 2016, Petitioner

testified that Respondent replied that she could not assist him. In January 2017, Petitioner initiated proceedings for M.A.Y. to be returned to Colombia. (Pet. Exs. 1E–1G.)

Respondent, on the other hand, testified that she while she has no interest in a relationship with Petitioner, she encourages M.A.Y.'s relationship with Petitioner and that M.A.Y. and Petitioner have had nearly daily contact. (Resp. Ex. 12.) Further, Respondent testified that while Petitioner pressured her to help him obtain United States residency, she made it clear to him that the only way she could sponsor his application is by marrying him, which she told Petitioner she would not do. Their agreement, Respondent testified, was that M.A.Y. would visit Respondent in Colombia first in November 2016, and then regularly during summers and also possibly during spring and winter breaks from school. Respondent's father, Samir Yusuf, who is a United States permanent resident, testified that Respondent's and Petitioner's original plan was for Respondent, Petitioner, and M.A.Y. to move to the United States, and that he would help Petitioner find work.

Since Respondent and M.A.Y. have lived in the United States, M.A.Y. has participated in religious services and attended preschool, prekindergarten, and kindergarten. (Resp. Exs. 5–7, 9.) M.A.Y. also participated in summer camp and regularly participates in gatherings with family and friends. (Resp. Ex. 5.) M.A.Y. is fluent in English and Spanish.

## APPLICABLE STANDARDS

The Hague Convention, implemented through ICARA, "was enacted to 'secure the prompt return of children wrongfully removed to or retained in any Contracting State' and to 'ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (quoting the Hague Convention). The Hague Convention "is intended as a rapid remedy for the left-behind

parent to return to the status quo before the wrongful removal or retention." *Id.* (internal quotation omitted).

Under ICARA, a person may initiate judicial proceedings for the return of a child by filing a petition in United States district court having jurisdiction.  22 U.S.C. § 9003(a), (b).  The court's review of the petition "is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *Ruiz*, 392 F.3d at 1250.

## ANALYSIS

Petitioner alleges that Respondent's retention of M.A.Y. in the United States after November 2016 was wrongful.[1]  Petitioner must establish, by a preponderance of the evidence, that M.A.Y. "has been wrongfully [ ] retained within the meaning of the Convention."  22 U.S.C. § 9003(e)(1).  Accordingly, to establish a prima facie case, Petitioner must prove that: (1) M.A.Y. was a "habitual resident" of Colombia immediately before the retention; (2) the retention was in breach of Petitioner's custody rights under Colombian law; and (3) Petitioner had been exercising those rights at the time of retention.  *Sewald v. Resinger*, No. 09-10563, 2009 WL 6767881, at *2 (11th Cir. Nov. 19, 2009) (citing *Ruiz*, 392 F.3d at 1251); *De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1190 (M.D. Fla. 2016) (explaining that, in a wrongful retention case, the petitioner must establish (1) that the child "was a habitual resident of Mexico immediately before Respondent's refusal to return the [c]hild"; (2) "the retention breaches Petitioner's custody rights under Mexican

---

[1] Petitioner does not seek a determination that Respondent's removal of M.A.Y. from Colombia in November 2015 was wrongful. (Dkt. 47.)  To the extent that Petitioner argues that Respondent's removing M.A.Y. from Colombia in November 2015 with no intention of returning to Colombia was a wrongful removal, the one-year statute of limitations set forth in Hague Convention Article 12 applies.  *See Lops v. Lops*, 140 F.3d 927, 945 (11th Cir. 1998) (quoting Article 12 of the Convention and stating "[w]here a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings . . . a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith," although "even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, [the judicial or administrative authority] shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.").

law"; and (3) "Petitioner was exercising those custody rights at the time of the retention"). If Petitioner satisfies this burden, M.A.Y. must be returned to Colombia unless Respondent establishes an affirmative defense under the Hague Convention. *Id.*; *Lops*, 140 F.3d at 945.

There is no dispute that Petitioner is M.A.Y.'s father and that Petitioner and Respondent share equal parental rights. Further, the evidence demonstrated that Petitioner has exercised his parental rights since M.A.Y.'s birth. (Pet. Exs. 1E, 1H, 1L; Resp. Ex. 12.) Specifically, Petitioner cared for M.A.Y., shared her expenses with Respondent, and attended to her medical emergencies. (See Pet. Ex. 1J.) What is in dispute is M.A.Y.'s habitual residence immediately before Respondent's alleged wrongful retention. Petitioner contends it was Colombia, while Respondent contends that she and Petitioner abandoned Colombia as being M.A.Y.'s habitual residence when they decided her habitual residence should be the United States. (Dkts. 47, 48.) The relevant time period to assess the child's habitual residence is "'immediately before the removal or retention.'" *See Fuentes-Rangel v. Woodman*, 617 F. App'x 920, 921 (11th Cir. 2015) (quoting Article 3 of the Hague Convention); *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1284 (S.D. Fla. 1999) ("Under the Hague Convention, the relevant period of habitual residence is that span of time 'immediately before' the date of the alleged wrongful retention.").

## I.    Parties' Shared Intentions

Although neither the Hague Convention nor ICARA define habitual residence, the Eleventh Circuit holds that "[t]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Ruiz*, 392 F.3d at 1252 (adopting the Ninth Circuit's approach set forth in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir.2001)). The court analyzes the parents' intent, *Id.* at 1253, and "the emphasis is on the *shared intentions of both parents* rather than unilateral intentions of one parent, *In re Mikovic v. Mikovic*, 541 F. Supp. 2d 1264, 1274

(M.D. Fla. 2007) (emphasis in original); *Tomynets v. Koulik*, No. 8:16-CV-3025-T-27AAS, 2017 WL 2645518, at *2 (M.D. Fla. June 19, 2017) ("The shared intention of the parents governs."). The court should inquire into the parents' shared intent "at the latest time that their intent was shared." *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005); *In re R.C.G.J., a minor*, No. 5:16CV69-RH/GRJ, 2016 WL 3198285, at *3 (N.D. Fla. June 8, 2016) ("A useful starting point for determining a child's habitual residence is the parents' last shared intent.").

Here, the evidence establishes that Petitioner and Respondent shared the intent for the United States, not Colombia, to be M.A.Y.'s habitual residence. The parties' shared intent coupled with M.A.Y.'s coming to the United States in November 2015 and having acclimated to the United States since November 2015 supports the determination that the United States is M.A.Y.'s habitual residence. Specifically, as he testified, Petitioner participated in and encouraged M.A.Y.'s attaining United States permanent residency. Petitioner testified that he was aware of Respondent's attaining United States permanent residency and of her application for M.A.Y.'s permanent residency. He took M.A.Y. to her medical examination in October 2015, which he testified he understood to be a mandatory part of her application. Although Petitioner denied being present at M.A.Y.'s final interview before being granted permanent residency, he testified that he was aware of the interview and understood it also to be part of his plan with Respondent for the family to live together in the United States. Petitioner also testified that he took Respondent and M.A.Y. to the airport for their departing flight to the United States in November 2015, which he described as a happy occasion that symbolized a new beginning for the family in the United States. Respondent and Respondent's father likewise testified that the plan was for Petitioner, Respondent, and M.A.Y. to live in the United States.

Petitioner points to the Consent (Pet. Ex. 1D), to support his argument that his intent for M.A.Y.'s habitual residence to be the United States was conditioned on his ability to join Respondent and M.A.Y. in the United States.  In the Consent, Petitioner provides his authorization for M.A.Y. to leave Colombia with Respondent in November 2015, with a return date to Colombia specified as November 2016.  (Pet. Ex. 1D.)  The parties testified to their understandings of the meaning of the Consent.  Petitioner testified that he understood it to mean that if he was not granted a visa to the United States, the Consent ensured that M.A.Y. would return to Colombia in November 2016.  Respondent, on the other hand, testified that the parties agreed that M.A.Y. would visit Petitioner in Colombia in November 2016.

Even if Petitioner's testimony is credited, the evidence nonetheless supports the conclusion that Petitioner and Respondent shared the intent that M.A.Y.'s habitual residence would change from Colombia to the United States.  *See Sanchez-Londono v. Gonzalez*, 752 F.3d 533, 541 (1st Cir. 2014) (affirming the district court's finding that there was no condition that a child would return to Colombia with the mother if the mother could not gain admission to the United States because the evidence showed that the parties agreed that the child should be in the United States and that the mother agreed the father could raise the child in the United States); *De La Riva*, 183 F. Supp. 3d at 1193–94 (concluding that despite the parties' disagreement about whether they had agreed that the respondent would join the petitioner and the child in Mexico, the parties shared the intent that the child "would abandon his habitual residence in the United States and take up a new one in Mexico"); *Sewald*, 2009 WL 6767881, at *2 (concluding, after a de novo review, that the child's habitual residence was Germany, the country where the parents shared the intention for the child to live even though the parents "entertained different ideas initially about where [the child]

- 10 -

should be raised").  The evidence presented supports a finding that the last shared intent of the

parties was to relocate to the United States.

Petitioner cites cases to support his argument that travel authorizations, like the Consent,

are viewed by courts as authorizations to travel with the expectation of the child's return.  (Dkt.

47 at 10–11, 14–15.)  For example, *Mendez Lynch* involves a mother who took her children from

their habitual residence of Argentina to the United States without their father's knowledge.

*Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347 (M.D. Fla. 2002).  There, as an affirmative

defense, the mother argued that the father consented to her removing the children from Argentina

because the father executed, many years earlier, a consent for the children to travel with their

mother in his absence.  *Id.* at 1358.  The Court rejected this argument, concluding that "[t]he

evidence is clear that the written consents to travel were given to facilitate family vacation-related

travel, not as consent to unilaterally remove the children from Argentina at the sole discretion of

Respondent."  *Id.*; *Mustafa v. Munoz*, No. 8:17-cv-49-T-17AEP (M.D. Fla. Feb. 10, 2017) (same);

*Moreno v. Martin*, No. 08-22432-CIV-LENARD, 2008 WL 4716958, at *11–12 (S.D. Fla. Oct.

23, 2008) (same); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1283 (N.D. Ga. 2004) (same).

These cases are inapposite, however, because they do not examine travel authorizations in the

context of determining the child's habitual residence, which is an element of a petitioner's prima

facie case, but instead examine them in evaluating whether the petitioners consented to the removal

of their children, which is an affirmative defense when the child's habitual residence is found to

have been the country from which the child was removed.  Further, these cases involve situations

where petitioners removed children from their habitual residences without the respondents'

knowledge.  Moreover, the cases Petitioner relies upon lack the evidence that exists in this case,

which demonstrates Petitioner's desire and plan for M.A.Y.'s habitual residence to change to the United States.

## II.    Actual Change in Geography and M.A.Y.'s Acclimation

"Although the settled intention of the parents is a crucial factor, it cannot alone transform the habitual residence." *Ruiz*, 392 F.3d at 1253. The second step toward acquiring a new habitual residence is "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." *Ruiz*, 392 F.3d at 1253; *In re S.L.C.*, 4 F. Supp. 3d 1338, 1346–47 (M.D. Fla. 2014) (explaining that "[d]etermination of a habitual residence focuses on the existence or non-existence of a settled intention to abandon the former residence in favor of a new residence, coupled with an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized").

It is undisputed that there was an "actual change in geography" because M.A.Y. came to the United States from Colombia in November 2015. *See Ruiz*, 392 F.3d at 1253. Further, the evidence shows that there has been a "passage of a sufficient length of time for [M.A.Y.] to have become acclimatized" to the United States. *Id.* The relevant consideration is "whether the child's relative attachments to the countries have changed to the point where ordering the child's return would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Boehm v. Boehm*, No. 8:10-CV-1986-T-27TGW, 2011 WL 863066, at *4 (M.D. Fla. Mar. 10, 2011) (quotation omitted). Factors for consideration include the child's school enrollment, participation in social activities, the length of stay in each country, and the child's age, *Boehm*, 2011 WL 863066, at *4, as well as the child's fluency in the local language, *De La Riva*, 183 F. Supp. 3d at 1194.

The evidence shows that while M.A.Y. attended nursery school in Colombia from January 2015 through November 2015 (Pet. Ex. 1H), she has attended religious services, preschool, prekindergarten, and kindergarten since moving the United States in November 2015.  (Resp. Exs. 5–7, 9.)  Further, the Court heard testimony from family and friends who regularly see M.A.Y. in the United States.  Barbara Papantonakis, who works with Respondent and is Respondent's boyfriend's aunt, testified that she taught M.A.Y. in a summer camp and sees M.A.Y. on a monthly basis at various gatherings of friends and family, during which she has observed M.A.Y. with friends she has made at summer camp and school.  Both Petitioner and Respondent have relatives residing in the United States.  Respondent's father, who lives in Florida, testified that he sees M.A.Y. usually twice a month at family gatherings, and that his mother, brothers, wife, and three children also live in the United States, as well as the child's maternal aunt.  Finally, Respondent's boyfriend's mother testified that she picks up M.A.Y. up from school on a daily basis and spends time with M.A.Y. regularly at gatherings with family and friends.  Therefore, the evidence shows that since moving to the United States, M.A.Y. has been enrolled in preschool and now kindergarten, M.A.Y. is fluent in English, and M.A.Y. has a network of friends and family with whom she regularly participates in activities.  (See Resp. Ex. 5.)

Because the United States, not Colombia, is M.A.Y.'s habitual residence, Petitioner cannot establish a prima facie case of Respondent's wrongful retention of M.A.Y.  Accordingly, it is **RECOMMENDED** that Petitioner's Verified Petition for Return of the Child to Colombia (Dkt.

6) be **DENIED**.

　　　　**IT IS SO REPORTED** in Tampa, Florida, on October 19, 2017.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

- 15 -

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:
The Honorable Virginia M. Hernandez Covington
Counsel of Record