## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOHAN SEBASTIAN ALZATE CALIXTO,   )
   acting on behalf of infant child,   )
M.A.Y.,   )
       )     Case No.: 8:17-cv-2100-T-33JSS
      Petitioner,   )
       )
  -against-   )
       )
HADYLLE YUSUF LESMES,   )
       )
      Respondent.   )
       )

## OBJECTION TO MAGISTRATE'S REPORT AND RECOMMENDATION DENYING PETITIONER'S VERIFIED PETITION FOR RETURN THE CHILD TO COLOMBIA

The Petitioner, JOHAN SEBASTIAN ALZATE CALIXTO, files this, his Objection to Magistrate's Report and Recommendation denying the Verified Petition for Return of the Child to Colombia, and, for the reasons set forth below, requests that the Report and Recommendation be rejected, and that the Petition be GRANTED, and the child returned to a jurisdiction that can adjudicate the merits of the custody matters between the parties, supporting the goals of the Convention.

## STANDARD OF REVIEW

As a preliminary matter, under Federal Rule of Civil Procedure 72(b), the district judge must consider any objections to a Magistrate's Recommendation *de novo*. See Fed.R.C.P. 72(b)(3). For the sake of brevity, Petitioner incorporates as if fully referenced herein, all prior pleadings and arguments into this Objection, including but not limited to Petitioner's extensive trial brief filed on October 13, 2017. (Dkt. 47).

The Magistrate Judge erred by:

● Disregarding the correct legal standard used to determine the habitual residence of M.A.Y., by failing to consider the case law from this Court and other courts that have declined to find a change in habitual residence when a family agrees to take up residence in a new location on a trial or conditional basis;

● Disregarding the preponderance of the evidence of the conditional or trial basis for the move to the United States and the agreement between the parties that M.A.Y. would be returned to Colombia in November of 2016;

● Disregarding the *ne exeat* rights bestowed upon Petitioner by a signatory contracting State, the Colombian Civil Law known as the *Patria Potestas*; namely his right to obligate the Respondent to return the child to Colombia no later than November, 2016;

● Controverting the main purpose of the Convention, which is to prevent "the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child."

## RELEVANT FINDINGS OF FACT IN REPORT AND RECOMMENDATION

1)      Petitioner testified further that he and Respondent shared the goals of attaining United States permanent residency for M.A.Y. and ***living together as a family*** in the United States. ¶2, p.3

2)      ...he testified that he was aware of the interview and believed it to be part of his plan with Respondent for them to ***live as a family*** in the United States. ¶2, p.3

3)      Respondent told the Petitioner that the purpose of the trip (to the United States) was

for her to do the appropriate paperwork to ***allow Petitioner to live in the United States***. ¶1, p.4

4)      Petitioner testified that (the child's) authorization could be granted for any length of time or an indefinite length of time, and that he understood the Consent to mean that if he was unable to reside in the United States, then M.A.Y, would return to Colombia in November 2016. ¶3, p.4

5)      Petitioner testified that Respondent's lack of assistance was contrary to Petitioner's and Respondent's agreement that Respondent would petition for Petitioner's ability to live in the United States so that ***the three could live together in the United States as a family.*** ¶3, p.5

6)      Respondent's father, Samir Yusuf, who is a United States permanent resident, testified that Respondent's and Petitioner's original plan was for Respondent, Petitioner, and M.A.Y. to move to the United States, ***and that he would help Petitioner find work***. ¶2, p.6

(emphasis supplied in various locations throughout objections)

Petitioner notes that the Magistrate made no credibility determinations or factual findings that would preclude the District Judge from ordering the return of the child to Colombia.

## ANALYSIS

### I. Lack of Mutual Intent

Of critical importance is the Magistrate's erroneous finding that Petitioner shared the intent for the child to permanently relocate to the United States.  In support of that conclusion, the

Magistrate cites and improperly applies the case of <u>Sanchez-Londono v. Gonzalez</u> to the case at bar. 752 F.3d 533 (1st Cir. 2014). Respondent erroneously suggested, and the Magistrate followed, that <u>Sanchez-Londono</u> stands for the proposition that a party's inability to legally immigrate to the United States does not negate consent for a permanent relocation. (Respondent's Trial Brief Dkt. 48). However, that suggestion is an oversimplification of a ruling based on an inapposite set of facts. In <u>Sanchez-Londono</u>, the Petitioner mother was a citizen of Colombia, illegally residing in the U.S., while the Respondent father was a U.S. citizen. <u>Id.</u> at 537. The child ***was born in the U.S. and resided here for two years*** when Petitioner decided to return to Colombia with the child in order to legally immigrate back to the U.S. <u>Id.</u> Both Petitioner and Respondent intended the child's stay in Colombia to be temporary. <u>Id.</u> However, the child remained in Colombia for two-and-a-half years, which was longer than expected. Id. The parties eventually decided to send the child back to the U.S. without Petitioner, as she had not yet obtained the ability to enter the U.S. legally, despite numerous attempts. <u>Id.</u> The <u>Sanchez-Londono</u> court, given those facts, correctly noted that "nothing in the record suggests that the mother ever intended that E.G.'s time in Colombia be anything but temporary prior to the date of the child's retention." <u>Id.</u> at 541.

Unlike the instant case, the <u>Sanchez-Londono</u> case found it dispositive that "there was no condition, agreed or otherwise, that E.G. would return to Colombia if the mother could not gain admission to the United States." <u>Id.</u> Furthermore, the court noted, "Both parties intended for the separation of mother and daughter to end with the mother's return to the United States, not with E.G.'s return to Colombia." <u>Id.</u> In contrast, the travel consent executed by the Petitioner herein clearly shows that the separation would end with M.A.Y. returning to Petitioner in Colombia, if the agreed-to condition was not met. That specific condition, as was admitted by Respondent, was that

4

Petitioner was able to join the family in the United States; Respondent also admitted that Petitioner maintained a subjective belief that Respondent could assist him with his visa process.

The Second Circuit, in a series of similar cases, reached the exact opposite conclusion of the Magistrate Judge's application of Sanchez-Londono. In Gitter v. Gitter, the Court enumerated a standard to apply in determining a child's habitual residence: First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at ***the latest time that their intent was shared***. 396 F.3d 124, 134 (2d Cir. 2005). Second, the court should inquire whether the evidence ***unequivocally*** points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent. Id. The facts of Gitter involve a Petitioner father with Israeli citizenship and Respondent mother with dual U.S. and Israeli citizenship. Id. at 128. Petitioner persuaded Respondent to move to Israel on a trial basis of one year. Id. After the trial period was extended for a period of six-months, Respondent returned to the U.S. for a purported vacation and never returned to Israel. Id. at 129. The Second Circuit did not disturb the district court's findings that, although Petitioner may have intended a permanent relocation, Respondent's understanding of the move was of a trial nature. Id. at 35. Under those circumstances, there was no settled mutual intent to shift the habitual residence. Id.

The Court next considered Mota v. Castillo, where the Mexican parents endeavored to move to the United States illegally with the child. 692 F.3d 108, 110 (2d Cir. 2012). The Respondent father moved to New York first, and the child was subsequently smuggled across the border three years later. Id. The petitioner made repeated unsuccessful attempts to gain entry to the United States and join her family. Id. Although Respondent pointed out that there was no evidence that Petitioner's

consent was conditioned on her own ability to immigrate, the Court inferred the condition existed based on the testimony adduced as trial. Id. at 114-115. Specifically, the Second Circuit found that the impression of the Petitioner from the record, "is that of a committed parent who has sought to keep her child close to her." Id. at 115. Moreover, the Court noted that the record is devoid of any suggestion that the petitioner intended to permanently abandon the child. Id. Therefore, the Court essentially imputed conditional consent. Id. at 115. When a condition is not met, the Court must look to the latest time that the parties' intent was shared. Id. at 113-114 (citing Gitter v. Gitter, 396 F.3d 124 (2d Cir. 2005). *If one party intends for the relocation to be conditional, and the other does not, there cannot be a shared intent*. Id. At 115. The Mota court found that the last time the parties shared an intent with regard to the habitual residence was before the agreement to relocate to the United States. Id. Therefore, the habitual residence was determined to be Mexico. Id.

The Second Circuit addressed a similar scenario the following year in Hofmann v. Sender, 716 F.2d 282 (2d Cir. 2013). Petitioner father was a Canadian citizen, while the Respondent mother was a resident of the United States. Id. at 285. The couple met and married in Canada. Id. After the birth of their two children, the parties entertained the possibility of relocating to New York. Id. at 286. Ultimately, Respondent took the children to New York and stayed with family while Petitioner sought a U.S. visa and employment in the U.S. Id. Before that happened, Respondent filed for divorce. Id. at 289. Petitioner, in turn, petitioned for relief under the Hague Convention. Id. Again, the Second Circuit upheld the district court's finding that, although Petitioner consented to the children's removal to the U.S., *his consent was contingent on his accompanying them and residing with them as a family.* Id. at 293.

In Murphy v. Sloan, the Ninth Circuit ruled that the relocation of mother and child to Ireland

for a "trial period" did not result in the child acquiring a new habitual residence, despite the "trial period" lasting three years. 764 F.3d 1144 (9th Cir. 2014). The purpose for the move was to enable the mother to obtain a master's degree, and the parents never shared the intent that the move to Ireland be permanent. Id. at 1148. On appeal, the Ninth Circuit affirmed the district court's finding that the parents did not have a shared, settled intent to abandon the United States as the child's habitual residence. Id. at 1152. The appellate court also rejected the invitation to revise it's holding in Mozes, noting that "nearly every circuit has adopted our view of the proper standard for habitual residence, which takes into account the shared, settled intent of the parents and then asks whether there has been sufficient acclimatization of the child to trump this intent." Id. at 1150-1151. The Court reaffirmed: "Where a child has a "well-established habitual residence, simple consent to [her] presence in another forum is not usually enough to shift" the habitual residence to the new forum. Id. at 1150. (Citing Mozes v. Mozes, 239 F.3d 1067, 1081 (9th Cir. 2001)). "Rather, the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, such as when there is effective agreement on a stay of indefinite duration." Id. (Citing Mozes, 239 F.3d at 1081). Finally, the court rejected the mother's contention that the child had become acclimatized to Ireland despite the fact that she had lived in Ireland for three years. Id. at 1153.

Equally misplaced is the Magistrate's reliance on Sewald v. Resinger in support of the habitual residence finding. No. 09-10563, 2009 WL 6767881 (11th Cir. Nov. 19, 2009). In that case, the German mother became pregnant in the U.S., and returned to Germany while pregnant for a visit when she decided, unilaterally, to stay permanently. Respondent implicitly agreed for the child to remain in Germany and made frequent visits. After the child had lived in Germany for two years,

7

Petitioner mother and child visited Respondent in the U.S.  Respondent prevented the child from returning to Germany by concealing the child's passport.  The Eleventh Circuit opined that, "the objective evidence revealed that Petitioner and Respondent, over time, came to share the intention that absent the couple's reconciliation - A.R. would reside in Germany with his mother."  The same cannot be said for Petitioner and Respondent at bar.  Our Petitioner did not allow M.A.Y., to reside in the U.S. for two years unobstructed.  Rather, Petitioner pursued every avenue of return after learning of Respondent's deceit in obtaining his temporary consent, which was limited to one year when given.

De La Riva v. Soto also provides no support for the conclusion that M.A.Y.'s habitual residence was the U.S. at the time of the wrongful retention, as the Magistrate's report contends. That case involved two Mexican citizens who had a child while living in the U.S. illegally. 183 F. Supp. 3d 1182, 1187 (M.D. Fla. 2016). At some point, the couples' relationship dissolved and the Petitioner returned to Mexico with the child. Id. at 1188. Respondent did not object to that living arrangement on the basis that the Petitioner would not seek child support and the child would visit the U.S. on occasion. Id. The child lived in Mexico for four years until Respondent retained the child during a visit to the U.S.  Id. The Southern District correctly concluded that, while the child's original habitual residence was the U.S., it had changed to Mexico prior to the date of wrongful retention by agreement of the parties. Id. at 1193. The court noted that Respondent did not object to his child's move to Mexico, and that Petitioner kept her promise of not pursuing child support and allowing the child to visit. Id. at 1193 -1194. Since the facts of De La Riva are vastly different from the facts at bar, it cannot be relied on to support that M.A.Y.'s habitual residence is the U.S.

The Magistrate is bound to follow binding circuit (or sister circuit) precedent. There is ample

record evidence here that Petitioner is an extremely devoted father and would not voluntarily relinquish his custody rights to his child, which is what an agreement to permanently shift the habitual residence would do, if the conditions the parties agreed upon were not met. Unlike Mota, however, the Court need not infer or impute conditional consent. Petitioner testified (and the Magistrate Judge found) that the agreement to relocate to the United States was predicated on the expectation that Petitioner would also relocate and the parties would live as a family in the United States. (R&R line 15, p.3) There is documentary evidence to corroborate the existence of that condition, as evidenced by the one-year travel authorization, required by the immigration authorities pursuant to Civil Law of the *Patria Potestas* in Colombia. (Pet. Ex. 1d ). That document provided assurance to the Petitioner that, if the visa and intact family endeavor failed, the child would be returned to Colombia. The Magistrate's factual findings support the fact that there was only a conditional consent to travel to the United States, and those findings are outlined above in the relevant findings of fact.

While the Magistrate correctly states that one must look to a party's actions and not their statements of intent when in dispute, the Magistrate failed to do so. Instead, Magistrate gave more weight to Petitioner's ambiguous use of the words "new beginning" than a legal document required by the Colombian Immigration Authorities and utilized by the attorneys of the Central Authority to initiate the Hague proceeding in Bogota; a formal document specifically outlining the limited permission for the child to cross international borders. What can be more indicative of a party's intent than a contemporaneously written document, prior to this dispute, concerning the travel of the minor child pursuant to the laws of the country of the left behind parent? Also, the document was required by Colombian immigration authorities. If Respondent's testimony regarding the consent

was credible, the consent would have stated a term of travel which was indefinite or permanent. Respondent could not have gained the permission of Petitioner for an indefinite or permanent travel consent form, because that was never the agreement. The agreement was that Respondent would assist the Petitioner with his immigration process and he would attempt to join the family in the United States within the year. If the condition was not met, the Respondent was to return the child to Colombia no later than November, 2016. (Pet. Ex. 1d). Unknown to Petitioner, Respondent had already begun a new relationship in the United States, and she had no intention of ever returning to Colombia with the child, despite her completely disingenuous representations to the Colombian government in November of 2015.

Petitioner's actions subsequent to what he determined ultimately to be a deceitful, wrongful scheme by Respondent support the contention that Petitioner did not agree to a permanent relocation of the child. Unrebutted facts were that, as early as December of 2015, Petitioner sought help from various government entities to obtain the return of the child. He attempted and failed to obtain a visa. He contacted the Central Authority. Those actions speak louder than Respondent's assertions (denied by the findings of fact by the Magistrate) that the agreement was for the child to return to Colombia for merely a visit in November of 2016. No custody proceeding was ever initiated in Colombia and no custody order nor diversion from equal custodial rights can be espoused by Respondent, as the Petitioner has equal custodial rights that have at all times been exercised, prior to unilateral actions of the Respondent in violation of the written travel authorization. Respondent's own testimony portrays Petitioner as a hyper-vigilant father that would never agree to abandoning the opportunity to ever see his child again. Yet this Court's refusal to use its summary return procedure in the face of acknowledging Petitioner's equal parenting rights will end in such a result.

10

The underlying premise of the Hague Convention is that a child's country of habitual residence is the place where ***decisions relating to custody and access are best decided***. Bocquet v. Ouzid, 225 F. Supp. 2d 1337, 1340 (S.D. Fla. 2002). Petitioner can't obtain a travel visa to attend future hearings in the United States, let alone financially battle a paternity and custody matter. The Magistrate's finding that the Petitioner and Respondent continue to "share equal parental rights" is belied by the fact that at the time of trial, the Petitioner had not seen his child in nearly two years due to unilateral actions of the Respondent, which were vigorously opposed by Petitioner. (R&R line 4 page 8). Respondent testified and the documentary evidence unequivocally proves that Respondent has no intention of ever returning to Colombia nor providing the Petitioner access to the child in Colombia. Respondent also refused any attempts at mediation and/or alternative dispute resolution when requested by our Department of State. (Pet. Ex.1g).

In a 2006 case involving a travel consent executed for a minor in Colombia, the Southern District opined as follows:

> "Consent need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a). Often, the Petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute. The consent and acquiescence inquiries are similar, however, in their focus on the Petitioner's ***subjective intent***. In examining a consent defense, it is important to consider what the Petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the Petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a Petitioner initially allows children to travel, and knows their location and how to contact them, does not

necessarily constitute consent to removal or retention under the convention." Garcia v. Angarita, 440 F. Supp.2d 1364, 1380 (S.D. Fla. 2006)(citing Baxter v. Baxter, 423 F.3d 363, 371-372 (3rd Cir. 2005).

In Garcia, Petitioner executed a Colombian travel consent based on Respondent's representation that the children were going to visit an uncle in New York. 440 F. Supp.2d at 1370. However, Respondent took the children to Miami, with the intent never to return to Colombia, believing she had the legal right to do so by virtue of the travel authorization. Id. at 1371. Although the consent specified an unlimited duration, the Court determined that the Petitioner/Father's subjective intent was that the travel entail only a visit to the United States, not a permanent relocation. Id. at 1376. The Garcia court suggested the New York visit was a ruse to obtain Petitioner's travel consent so that Respondent could move to Miami with her boyfriend. Id. at 1371. That Petitioner, like the Petitioner at bar, testified that he would never have signed the authorization if he had known the true purpose.[1] Id. at 1370. Acknowledging Respondent's deceit in obtaining the travel consent, and finding Respondent lacked credibility, the Southern District returned the children to Colombia. Id. at 1368-1371.

Respondent here used the same kind of deceit. She admitted to starting a relationship with another man in the U.S. before obtaining the travel consent from Petitioner. Audio evidence admitted

---

[1] See also In re Ahumada Cabrera, 323 F.Supp.2d 1303, 1313 (S.D.Fla.2004) (a mother's retention of a child in the United States only became wrongful when the child's father became aware of her true intention not to return, even though the father earlier knew the mother and child were not returning on the date they were originally supposed to return and he had agreed to let the child finish the school year; the father made efforts to obtain assistance in Argentina through the Central Authority in obtaining return of the child, rebutting the defense that he acquiesced to the child's removal).

at trial, in the form of voicemail messages, showed that, despite that new relationship, Respondent continued to encourage Petitioner to believe that they would be a family. (Pet. Ex. 6). Believing she had succeeded, Respondent even admitted that she lied to get the Petitioner to sign the consent form. (Pet. Ex. 5).

In an eerily, nearly identical, factual pattern from 2016, an unwed Petitioner father from Colombia, had agreed in writing to the Respondent mother's request to allow her to travel to the United States with their seven-year-old son *for three months, ending on June 30, 2015.* Lagos v. Villareal, No. 16-3390 (U.S. Dist. Ct. N.J. Oct. 31, 2016). Once in the United States, however, the Respondent immediately moved in with her new boyfriend. Petitioner claimed that she then began cutting off his communications with his son, discontinuing the home phone land line, and ceasing to answer his emails. Respondent then filed an action for sole custody in the Superior Court of New Jersey, Bergen County. Although the Petitioner was never served with the Summons and Complaint, an Order granting sole custody of the child to the Respondent was entered. The Respondent then immediately forwarded a copy of that Order to the Petitioner and demanded that the Petitioner pay child support. Stranded in Colombia without his son, Petitioner filed for relief from the Federal District Court in New Jersey through the Hague Convention. Respondent, after being notified of the Hague, re-instituted contact between the Petitioner and the child. At time of Petitioner's filing, the child had been in the United States for approximately 15 months.

After two full days of testimony, the Federal Judge issued a twenty-four page decision in which he found that the mother had wrongfully retained the child in the United States in violation of the father's parental rights under Colombian law; that the child's country of habitual residence at the time of the wrongful retention (18 months prior) was Colombia; the father had not acquiesced

13

or consented to the wrongful retention; and that the mother had failed to meet her burden of proof with regard to each of the affirmative defenses she had raised. In so doing, the Court reasoned that the integrity of the written travel permit, with a hard return date, was bolstered by the fact that it was an official government document that was submitted to Colombia's Immigration Department, such as in the case at bar.

There can be no dispute that the consent in the case at bar was for a limited, one year basis. The Petitioner and Respondent both testified that Petitioner began vigorously challenging the Respondent's move with the child to the United States, albeit with limited resources, beginning as early as December 2015, when he learned of the Respondent's new romantic relationship.

The unilateral intent of one parent simply does not establish a joint settled intention. There is ample evidence that the hope and aspiration of the Petitioner was that he would be moving to the United States to be with the Respondent and child as an intact family. Petitioner may well have naively hoped that the Respondent would do as she had promised. But looked at objectively, the evidence only establishes that the Petitioner permitted the child to travel to the United States and expected that he would follow within the year; but that at no time did Petitioner abandon his habitual residence in Colombia. He did not break his ties with that country. He did not give up his job driving taxi nor resign from it. Both parties have maternal and paternal family in Colombia; in fact, Petitioner continues to reside in the home of Respondent's mother, where the family previously resided with the minor child. Insofar as there may have been a common intention, the parties may have agreed that they would attempt to obtain immigration papers for Petitioner so that he could travel to the United States. However, the condition was never met. Respondent admits that she never attempted to assist the Petitioner, despite admitting his subjective belief that she could and would

14

do so. The evidence cannot support a finding that the parties shared a settled intention, as the Petitioner's condition of traveling to the United States was never realized prior to the expiration of the one year. What is clear from the evidence and the findings of fact is that the Petitioner's intention to travel to the United States was of an entirely speculative nature, which in turn depended upon unresearched investigation into the immigration process, which Petitioner subjectively believed could be resolved by actions by the Respondent, as she admitted. Petitioner also genuinely but naively thought the Respondent's father could assist him in possibly obtaining work. (R&R line 12, p.6) That is quite different to the Magistrate's finding that the parties shared an intent for the habitual residence of the minor child to become permanently the United States and that Petitioner would never ever see his child again. [2]

It is stated U.S. policy to "deter child abductions" and that "the Convention's purpose [is] to prevent harms resulting from abductions," which "can have devastating consequences for a child" and may be "one of the worst forms of child abuse" that "can cause psychological problems ranging from depression and acute stress disorder to posttraumatic stress disorder and identity formation issues" and lead to a child's experiencing "loss of community and stability, leading to loneliness, anger, and fear of abandonment" and "may prevent the child from forming a relationship with the left-behind parent, impairing the child's ability to mature." There is no dispute that the purpose of

---

[2] In the case of Re A (Wardship: Jurisdiction), 1 F.L.R. 767, 773 (Eng.Fam.Div.1995), a case cited by the Mozes court, the child lived in England for the first two years of her life, then Pakistan for four years, then England for two years, after which the parents agreed that child should attend school in Pakistan for two years while living with the father's relatives. After approximately one year of the alleged agreement, the mother sought return of the child to England. Although the child by that point had spent more than half her life in Pakistan, the court held that the parties' agreement was "temporary and conditional," and not sufficient to change the child's habitual residence.

the Convention is turned upside down by the ruling in this case, wherein the Petitioner may never see his child again.

The evidence herein simply does not support an identified settled purpose. Moreover, the Magitsrate's finding that the Petitioner voluntarily agreed to what amounts to a complete breach of his "equal parental rights" is wholly unsustainable.

For these reasons, Petitioner has met his burden of proving, by a preponderance of the evidence, that Colombia was M.A.Y.'s habitual residence at the time of the wrongful retention, as the condition upon which M.A.Y. traveled to the United States had not been met as of November, 2016, and the Respondent failed to return the child as obligated to do.

II.    **Interference with Petitioner's rights of ne exeat**

An analysis of international law on the Hague confirms that courts and other legal authorities, not only in the United States but in many other contracting States such as Colombia, have all agreed that ne exeat rights are rights of custody within the meaning of the Convention. A ne exeat provision is a statutory or court ordered provision that forbids (or limits) a parent from leaving a jurisdiction with a child without consent from the other parent or a court.

ICARA, at 42 U.S.C. § 11601 et seq. (2000), "seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and *to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States*." The Colombian ne exeat right was classified by the United States Supreme Court in <u>Abbott v. Abbott</u> as a "joint right of custody," which Art. 5(a) of the Convention defines as "including rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." 130 S. Ct. 1983, 1989-1990 (2010). Petitioner's right to decide M.A.Y.'s

16

country of residence allows him to "determine the child's place of residence," which also includes

a determination of the child's residence for a specific, limited amount of time. (In this case, one year

to expire in November, 2016). (Pet. Ex. 1d).

The Magistrate failed to acknowledge the legal significance of the Petitioner's ne exeat rights

vis a vis the specific travel consent form, which was required by Colombian Civil Law to be

executed by Petitioner. [3] Both Petitioner and Respondent admitted that Petitioner's authorization

was required before the child could be taken out of Colombia alone with the Respondent. *Patria*

*Potestas* rights over the child were being exercised by both parents in November 2015, since

Petitioner had not been deprived or limited with respect to those rights by any judicial decision. No

court had given Respondent unilateral decision making authority to permanently relocate the child

nor to modify the terms of the travel consent. Thus, both parents were responsible for the upbringing,

education, personal care and education of the children, and the express authorization of both parents

was required for the children to leave the country.

The Magistrate erroneously applied the Convention by failing to consider the plain language

of the travel consent form, which represented the Petitioner's ne exeat rights in Colombia pursuant

to *Patria Potestas*, and required that the Respondent return the child to Colombia no later than

---

[3] XIV of the Colombian Civil Code sets forth the rights of "Patria Potestas." Article 288 provides that "Paternal authority is the set of rights that the law acknowledges to the parents over their non-emancipated children. . . . "It further provides that, "The exercise of the parental authority over their legitimate children shall be exercised jointly by both parents. In the absence of one of the parents, the other parent shall exercise the paternal authority." Article 338 of the Colombian Minors' Code provides that, "When a minor is going to go out of the country with one of the parents or with a person different from their legal representatives, they should previously obtain the permission of the parent or legal representative who is not traveling, authenticated before a notary or consular authority"

November 2016. Magistrate's interpretation of the Convention to permit the Respondent to interfere with the Petitioner's ne exeat rights granted by the contracting State of Colombia runs counter to the Convention's purpose of deterring child abductions to a country that provides a friendlier forum. Denying the return of M.A.Y. actually legitimizes the actions of Respondent in refusing to return the child as obligated to do pursuant to law promulgated by the contracting State of Colombia and validates her negative, repugnant statements to the United States Department of State. (Pet. Ex. 1g). Knowing that Petitioner could never travel to the United States to see his child, knowing that she had refused to return the child as promised to do in November 2016, Respondent thereafter derided the Department of State and insinuated that Petitioner would never again see his child in Colombia, which will be the end result, in complete contravention to the purposes of the Convention and also the National Constitution in Colombia. [4] Specifically, Respondent advised the Department of State (Central Authority) that she was not interested nor obligated to ever return to Colombia. Respondent reconfirmed at trial that she never intended to return to Colombia, even for a visit.

The United States Supreme Court has directed that Federal Courts, when interpreting an international treaty, give meaning to the words of the treaty that are consistent with the shared expectations of other signatory nations. ElAl Israel Airlines, Ltd. v. Tsui Yuan Tseng, 626 U.S. 155 (1999). ICARA directs that "uniform international interpretation" of the Convention is part of the framework of the Convention. §11601(b)(3)(B). The object and purposes of the Convention are best served by providing a return remedy for violations of ne exeat rights promulgated by sister

---

[4] The National Constitution provides for the fundamental rights of children including the right to a family and not to be separated from it. This provision was the main legal basis for the Constitutional Court's assertion that the Hague Convention was compatible with Colombian constitutional principles.

Contracting States, such as Colombia.

Thus, for policy reasons, the <u>Abbott</u> court indicated that Courts should return children whose parents take them across international borders in violation of ne exeat provisions. 130 S.Ct. at 1992. A conclusion to the contrary "would render the Convention meaningless in many cases where it is most needed." <u>Id.</u> Ne exeat rights can ***only be honored with a return remedy*** because these rights ***depend on the child's location being away from its habitual residence***; because the Convention's purpose of deterring child abductions by parents who are looking for a friendlier custody forum would otherwise be compromised; and because international case law favoring such an interpretation should be respected." <u>Id.</u> at 1992-1996. There can be no gainsaying the policy of the Supreme Court as analyzed in <u>Abbott</u>.

The <u>Abbott</u> court also identified an underlying problem associated with these types of cases and added a reminder: "...Judges must strive always to avoid a common tendency that ought not interfere with objective consideration of all the factors that should be weighed in determining the best of interests of the child. This judicial neutrality is presumed from the Mandate of the Convention..." <u>Id.</u> at 1996.

The Petitioner exercised his ne exeat rights pursuant to Colombian law when he authorized the travel to the United States but required the return of the child to Colombia in November of 2016, if things did not go according to plan. [5] Although the Respondent did not enter the United States in

---

[5] Although Magistrate found that <u>Mustafa v. Munoz</u>, 8:17-cv-49-T-17AEP (M.D. Florida filed February 10, 2017). was inapposite to the case at bar, the basic facts are actually very similar. <u>Mustafa</u> involved an agreement for the Petitioner, a citizen of Sweden, to remain in Sweden but eventually join the Respondent and child in the United States after an immigration process was begun. As Judge Kovachevich found, things did not go according to plan, when Respondent disavowed the parties' agreement and failed to assist the Petitioner with an immigration process. The child was immediately returned

violation of the ne exeat rights of Petitioner, she violated the ne exeat rights of Petitioner when she failed to return the child in November of 2016. This exact behavior was held to be a wrongful retention in violation of such parental rights in <u>Lagos</u>, at the time the limited travel consent expired on a date certain. 16-3390 (U.S. Dist. Ct. N.J. October 31, 2016). Because the Supreme Court has ruled that ne exeat rights can only be honored with a return remedy, M.A.Y. should be returned promptly to Colombia, as that is the expectation of the signatory nation whose laws provided the Petitioner with those rights and whose laws permitted the Respondent to travel with the child.

## III.   There is a presumption that shared parental intent (or lack thereof) regarding a change in habitual residence generally trumps evidence of acclimatization

To infer abandonment of a habitual residence by acclimatization, the "objective facts [must] point unequivocally to [the child's] ordinary or habitual residence being in [the new country]." <u>Mozes</u>, 239 F.3d at 1081. There was no settled intent on the part of Petitioner to permanently change the habitual residence of M.A.Y. The travel consent is not ambiguous. At best, the travel consent document contemplated a possible future change in habitual residence, not a last shared, settled intent of the parents to permanently shift the habitual residence. The travel consent shows nothing more than that the Petitioner contemplated the return of the child in November of 2016, if things did not go according to plan, which they did not. Further, "courts should be slow to infer from . . . contacts [with the new country] that an earlier habitual residence has been abandoned," both because the inquiry is fraught with difficulty, and because readily inferring abandonment would circumvent the purposes of the Convention. <u>Id.</u> at 1079. Determinations regarding acclimatization are highly fact

to Sweden by this Court and the habitual residence was not determined to have shifted when the agreement to live as an intact family in the United States was unrealized.

bound, and there is no bright line as to the temporal limits for such adjustment. Nor should "acclimatization . . . be confused with acculturation." <u>Papakosmas v. Papakosmas</u>, 483 F.3d at 627 (9th Cir. 2007).

M.A.Y., now five years old, spent the first three years of her life in Bogota, Columbia. She speaks both English and Spanish. She has maternal and paternal family in both the United States and Colombia. M.A.Y. attended school and church in both countries. Petitioner resides in Colombia, but cannot travel freely to the United States. Respondent and M.A.Y, can travel freely back and forth. The Court viewed video evidencing that the child remains completely attached to the Petitioner (Pet. Ex. 7). These facts cannot point unequivocally to a conclusion that the habitual residence of M.A.Y. has shifted to the United States, so as to trump lack of shared parental intent or otherwise.

CONCLUSION

The first stated objective of the Convention is listed in its preamble: to protect children internationally from the harmful effects of their wrongful removal or retention. This objective has been described as both a desire to restore the status quo and to prevent the international removal of children "to secure a more favorable forum for the adjudication of custody rights." The terms and provisions of the Convention must be read to give effect to these purposes. The second stated objective of the Convention is to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."

Petitioner had an absolute right, pursuant to Colombian law, to restrict his permission for the minor child, M.A.Y. to travel for only one year to the United States, which he did. A ruling which denies the Petitioner his ne exeat right prescribed by law in the Contracting State of Colombia, is

inconsistent with the primary goals of the Convention. The ruling also ensures that the minor child will be raised by the Respondent alone in the United States and never returned for even a visit to Colombia, as Respondent represented to the Department of State. The child should be returned to Colombia, where the issues of custody and care are best decided.  To accept the Magistrate's Report and Recommendations would create a loss of confidence among signatory countries in the U.S. court's treatment of their legal systems and would have a chilling effect on measures developed to prevent international child abduction.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic filing to Kathleen Krak, Attorney for Respondent, on this ___ day of October, 2017.

Carmen R. Gillett, Esq.
Florida Bar No. 0375446
**CARMEN R. GILLETT, PLLC**
1845 Morrill Street
Sarasota, FL 34236
Phone: (941)366-9826
Fax: (941)366-9811
Attorney for Petitioner